UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 08-11782-GAO


CHRISTINE H. PACKARD,
Plaintiff,

v.

COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF PUBLIC SAFETY,
MASSACHUSETTS EMERGENCY MANAGEMENT AGENCY,
and DONALD R. BOYCE,
Defendants.


**ORDER ADOPTING REPORT AND RECOMMENDATIONS**
September 28, 2011


O'TOOLE, D.J.

The defendants' motion for summary judgment (dkt. no. 22) was referred to the
magistrate judge for hearing and a report and recommendation. After hearing, the
magistrate judge filed a report recommending that the motion be granted in some respects
and denied in others. The plaintiff has timely objected to three rulings recommended by
the magistrate judge. No objection has been made by the defendants.

After careful review of the objections and the relevant underlying submissions,
including the magistrate judge's report, I find the objections to be without merit and I
ADOPT the report and its recommendations.

Accordingly, the defendants' motion for summary judgment is ALLOWED IN
PART and DENIED IN PART. Specifically, Packard's claim of hostile work

environment is dismissed, but her remaining claims of sex discrimination and retaliation set forth in Counts I and III shall proceed to trial; her claim that her prescriptive right under the FMLA against termination is dismissed, but her claim in Count II that the defendants violated the FMLA by refusing to consider her for, or allowing her to apply for, the new Associate Director position shall proceed to trial; her claim against defendant Boyce for intentional interference (Count IV) shall proceed to trial; and her claim of intentional infliction of emotional distress (Count V) against Boyce shall be dismissed.

It is SO ORDERED.


/s/ George A. O'Toole, Jr.
United States District Judge

| | | |
|---|---|---|
| CHRISTINE H. PACKARD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 08-11782 GAO |
| COMMONWEALTH OF MASS. | ) | |
| EXECUTIVE OFFICE OF PUBLIC | ) | |
| SAFETY, MASS. EMERGENCY | ) | |
| MANAGEMENT AGENCY and | ) | |
| DONALD R. BOYCE, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

September 9, 2011

DEIN, U.S.M.J.

## I. __INTRODUCTION__

The plaintiff Christine H. Packard ("Packard") was employed by the defendant

Massachusetts Emergency Management Agency ("MEMA"), a department within the

Commonwealth of Massachusetts, Executive Office of Public Safety. This action arises

out of MEMA's termination of Packard's employment while she was out on maternity

leave authorized under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601,

et seq., and MEMA's failure to offer her a new position. The defendant Don R. Boyce

("Boyce") was the Director of MEMA and made the termination decision.

The defendants contend that plaintiff's position was eliminated as part of a reorganization. Plaintiff challenges that explanation and contends that, in any event, she should have been offered a position in the allegedly reorganized agency. By her complaint, Packard alleges that MEMA subjected her to sex discrimination, a hostile work environment, and retaliation in violation of Title VII, 42 U.S.C. 2000e, et seq. (Count I), that MEMA and Boyce, by such conduct, violated the Massachusetts Fair Employment Practices Act, Mass. Gen. Laws ch. 151B (Count III), that MEMA terminated her employment and failed to offer her the new position in violation of the FMLA (Count II), that Boyce intentionally interfered with her employment contract (Count IV), and that Boyce is liable for intentional infliction of emotional distress (Count V).

This matter is presently before the court on the Defendants' Motion for Summary Judgment by which the defendants are seeking judgment in their favor on all counts of the complaint. (Docket No. 22). For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the motion be ALLOWED IN PART and DENIED IN PART. Specifically, this court recommends that Packard's claim of hostile work environment be dismissed, but that her remaining claims of sex discrimination and retaliation in Counts I and III proceed to trial; that Packard's claim that her termination violated the FMLA be dismissed, but that her claim in Count II that the defendants violated the FMLA by refusing to consider her for, or allowing her to apply for, the new Associate Director position proceed to trial; that her claim against

-2-

Boyce for intentional interference (Count IV) proceed to trial; and that her claim of

intentional infliction of emotional distress (Count V) against Boyce be dismissed.

## II. STATEMENT OF FACTS[1]

The following material facts are undisputed unless otherwise indicated. The facts

are viewed in favor of the plaintiff, the non-moving party. See Vineberg v. Bissonnette,

548 F.3d 50, 56 (1st Cir. 2008).

Plaintiff, Christine H. Packard ("Packard"), was hired as MEMA's Preparedness

Branch Chief on October 25, 2004, an Administrator VII position. (DF ¶ 1; PF ¶ 1). In

that capacity, she was in charge of the agency's Nuclear Preparedness, Training,

Government Preparedness, and Planning Departments. (DF ¶ 2). Packard was one of

three Branch Chiefs at the time — the other branches being Response and Recovery and

Administration and Finance. (DF ¶ 1).

On April 1, 2005, Packard went out on a MEMA-approved FMLA maternity

leave, and she returned on August 1, 2005. (DF ¶ 3). She continued in her position as

Preparedness Branch Chief, and continued to receive "highly effective" and "exceptional"

overall performance ratings on her annual performance evaluations. (PF ¶ 13).

---

[1] The recitation of facts is complicated by the fact that neither party expressly addressed the other's statement of facts. The defendants submitted a statement of Undisputed Material Facts as part of their memorandum (Docket No. 24) ("DF"), exhibits which are attached to their motion (Docket No. 22) ("Def. Ex."), and the affidavits of Donald R. Boyce (Docket No. 23-1) and Debra Durling (Docket No. 23-2). The plaintiff filed a Local Rule 56.1 Statement of Material Facts at Genuine Issue and Undisputed Facts Precluding the Entry of Summary Judgment (Docket No. 27) ("PF") with attached exhibits ("Pl. Ex.").

In or about January 2007, Packard's immediate supervisor, Christine McCombs, left the agency and Ken McBride ("McBride") became the Acting Director of MEMA. (PF ¶ 12). On or about August 8, 2007, Packard requested, in writing, FMLA leave for the birth of a child. (PF ¶ 14). The leave was approved by Acting Director McBride for the period from December 31, 2007 to June 28, 2008. (PF ¶ 15). Meanwhile, on September 2, 2007, defendant Donald R. Boyce ("Boyce") was appointed by Governor Deval Patrick as the Director of MEMA. (DF ¶ 4; PF ¶ 17).

According to the defendants, Boyce, in consultation with others, decided to reorganize the agency to change its focus from grants and fiscal oversight of federal funds to mitigation, preparedness, response and recovery. (DF ¶ 5). In Boyce's view, this required a reorganization of the agency. (Id.). For her part, Packard contends that there was no need to reorganize or change the agency's focus, as MEMA was already an operational agency with a focus on mitigation, preparedness, response and recovery prior to Boyce's employment. (PF ¶ 18). Nevertheless, as detailed below, the undisputed facts establish that there was a reorganization of the agency while Packard was on leave.

According to Packard, during one of her initial meetings with Boyce prior to her leave, she informed him that she was pregnant. (PF ¶ 19). Boyce indicated that he was aware of her "condition." (Id.). Packard contends that following the meeting, Boyce continued to work closely with her male counterparts, but not with her. (PF ¶¶ 20-21). According to Packard, Boyce ignored her, and his conduct was noted by at least McBride, who was serving as Boyce's Chief of Staff. (PF ¶ 22-23).

On or about December 28, 2007, just a few days before Packard left for maternity leave, Boyce had a meeting with the Branch Chiefs and other senior staff. (DF ¶ 6; PF ¶ 24). According to Boyce, at the meeting he formally announced his intention to reorganize MEMA, something which had previously been discussed only on an informal basis. (DF ¶ 6). According to Packard, Boyce concluded the meeting by thanking Packard for all her years of public service and contributions to MEMA, prompting her to respond in no uncertain terms that she would be returning to her position at the end of her maternity leave. (PF ¶¶ 25-26). On December 31, 2007, Packard left for her maternity leave, with an expected return date of June 30, 2008. (DF ¶ 7). As he had done during her previous maternity leave, McBride assumed Packard's responsibilities. (PF ¶ 28).

Packard contacted Boyce in early February 2008, confirming her intention to return to work. (PF ¶ 29; DF ¶ 9). According to Packard, "Boyce stated that he 'respected' the reasons for her leave, but that it was for 'a long time' and that he would not wait to 'make changes.'" (PF ¶ 29). During this conversation, Boyce also stated to Packard that he was anxious for her to return to MEMA. (Id.). According to the defendants, "Boyce cautioned her that her leave was for 'a long time' and reorganization would not await the return of any one individual." (DF ¶ 9). Packard denies that Boyce ever told her that the reorganization would not await the return of any one individual. (PF ¶ 37).

On February 15, 2008, Kevin Beauregard, the Administration and Finance Branch Chief, resigned. (PF ¶ 31). There is evidence that his resignation was a mutual decision,

and was not motivated by the planned restructuring. (PF ¶¶ 30-32). On February 24,

2008, John Tommaney resigned as Response and Recovery Branch Chief, which resulted

in the elimination of this position as well. (DF ¶ 10). Again, according to Packard, this

was a voluntary termination, and Tommaney left to take another position. (PF ¶¶ 34-36).

Therefore, his departure was not motivated by the planned restructuring. (Id.). On

March 25, 2008, Boyce eliminated the Chief of Staff position held by McBride. (DF

¶ 11). According to Packard, McBride had intended to resign before any alleged

restructuring, and had told that to Boyce. (PF ¶ 33).

On March 26, 2008, Boyce unveiled a new organizational structure having a

Deputy Director of Field Services, an Associate Director for Administration and Finance,

and an Associate Director of Technical and Support Services in lieu of the Chief of Staff

and three Branch Chief positions. (DF ¶ 15). McBride was temporarily appointed as the

Acting Associate Director of Technical and Support Services. (DF ¶ 11). According to

the defendants, McBride was placed temporarily in this position when other job opportu-

nities for which he had applied fell through, and he was to be in this position only until

he could find employment elsewhere. (DF ¶ 11, Def. Ex. G (3/25/08 email)). Thus,

according to Boyce, this was a "placeholder" position for McBride, who was only 18

months shy of retirement. (Boyce Aff. ¶¶ 7-8). The defendants contend that McBride

was not qualified for the position, as it was a Manager VIII position. (Boyce Aff. ¶ 8).

McBride remained in the temporary position for 4 months, until July 2008, at which time

he found other employment, and resigned from MEMA. (DF ¶ 11). Thus, the only

Branch Chief who was negatively affected by this reorganization was Packard. (PF ¶¶ 71-72).

There is evidence that the day before the announced reorganization, Boyce asked the Director of Human Resources ("HR") if he could move Packard's office while she was out on FMLA leave. (Pl. Ex. 14). The HR Director responded:

> Christine, we can change, move, etc provided that we can show that the change, move, etc would have happened regardless of whether she was on fmla or not. If it is your intent not to reappoint bec your new org does not have a need for the function, let's discuss this further. I need to see your new TO.

(Pl. Ex. 14).

Shortly after the reorganization was announced, Packard sent Boyce an email asking for the opportunity to discuss the restructuring and her role in MEMA, but she never received a response. (PF ¶ 41; Pl. Ex. 15). Packard asserts that she was qualified for the Associate Director of Technical and Support Services position, although it was never offered to her. (PF ¶ 39). This will be discussed further below. She also contends that in or around this period, March 2008, her name was deleted from the MEMA staff directory. (PF ¶ 42).

On April 4, 2008, Boyce sent out a department-wide email, announcing that reassignments and physical relocations would be starting on that date, and announcing McBride's new role as Acting Associate Director of Technical and Support Services. (Pl. Ex. 16). Packard again tried to contact Boyce on or about April 11th, but he failed to return her call. (PF ¶ 44). In communications with HR, Boyce was counseled against

talking to Packard, but was also advised that, if he did, he should not "offer an explanation other than her position was eliminated due to a reorganization" because "Christine might push for more of an explanation and lead you into a place where you don't want to be." (Pl. Ex. 17; PF ¶ 45).

On May 27, 2008, two months after unveiling the new reorganization plan, and one month before Packard was due to return to work, Boyce returned a call made by Packard in the morning and told her that her position as the Preparedness Branch Chief had been eliminated, and that there would be no comparable position so Packard was being laid off. (DF ¶ 16; PF ¶¶ 47-48). According to the defendants, Boyce offered to try to place her in another job at the Department of Public Health, but Packard said that she knew people there and could manage on her own. (DF ¶ 16). However, according to Packard "[a]t no time was [she] given an opportunity to resign her position or be allowed to continue at MEMA until she found another position with the Commonwealth or for the three months until her pension benefits vested." (PF ¶ 49). No other Branch Chief was terminated, as they had all resigned voluntarily. (PF ¶ 71).

Boyce presented the new organization chart at a general staff meeting later in the day on May 27, 2008, and sent Packard a letter confirming the termination of her employment. (DF ¶ 18). Therein Boyce wrote:

> As we have previously discussed, the Massachusetts Emergency Management Agency (MEMA) is undergoing reorganization. This reorganization will enable MEMA to accomplish its mission in a more streamlined and effective manner. I am sorry to inform you that your position is being eliminated as an outcome of this

reorganization and as a result you are being laid off from your employment with MEMA. The duties of the position that you currently hold as the Preparedness Branch Chief will be distributed to other personnel within the organization. No equivalent or comparable positions exist within the agency at this time or will exist as a result of this reorganization.

(Def. Ex. I).

On May 29, 2008, MEMA posted the position of Associate Director of Technical and Support Services. (PF ¶ 52; DF ¶ 19). Packard filed a complaint of discrimination with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission on June 19, 2008. (DF ¶ 22). As noted above, McBride acted as the Acting Associate Director until July 2008. The position was permanently filled on December 11, 2008 by Richard Fitzgerald. (DF ¶ 21). It is undisputed that some of the responsibilities of the new Associate Director were the same as Packard's, and that at least 40% of the position was different than Packard's old position. (See Pl. Opp. (Docket No. 26) at 5 (it is undisputed that 60% of the Major Responsibility Areas for the new position were identical to Packard's Major Responsibility Areas)). However, the parties disagree as to whether Packard was qualified for the new position. (See DF ¶ 20; Pl. Opp. Mem. (Docket No. 26) at 5-6). Moreover, while it is undisputed that Packard did not formally apply for the position, (see DF ¶ 20), it is Packard's contention that Boyce had made it clear in his termination letter and in his conversation with her that there was no position for her in the new organizational structure. (See, e.g., PF ¶¶ 48, 72). The defendants do not seriously dispute her assessment.

-9-

According to MEMA, the new Associate Director of Technical and Support

Services position required qualifications and experience in information technology,

logistics and operations. (DF ¶ 19). Packard contends that she had such qualifications.

(PF ¶ 3). Moreover, she contends that a large part of the new position consisted of the

very same work she performed as Branch Chief of Preparedness. (PF ¶ 54). Thus, she

describes the new position as "essentially her prior position with only two added

responsibilities." (Id.). The same responsibilities were supervision of Civil and Nuclear

Planning, Training Coordination and the State Emergency Response Commission

("SERC"), while the new responsibilities were in Information Technology and Logistics

— areas in which, Packard contends, she was experienced as well. (PF ¶¶ 55-56).

The posting for the new Associate Director position described the position as

follows:

> The purpose of this position is to serve as a key member of the
> Executive Staff, as the primary source of technical support for the
> emergency management initiatives of the agency. Under the
> direction of the Director, MEMA, the Associate Director of Support
> Services directs and coordinates the agency's internal functions
> related to preparedness, planning, and outreach response to an
> emergency incident as it occurs, including but not limited to, natural,
> technological, nuclear, or civil defense hazards.
>
> This position will be responsible for overseeing the operations of the
> Civil and Nuclear Planning Unit, Training Unit, Information
> Technology Unit, the State Emergency Response Commission
> (SERC), and the Logistics Unit. By such efforts, the agency
> employs a framework within which the Commonwealth and its
> communities learn to reduce their vulnerability to hazards and
> improve their capabilities for mitigation against, preparedness

-10-

response to, and recovery from threatened or actual natural disasters, acts of terrorism, or other man-made events.

(Pl. Ex. 19). The posting further explained that the Associate Director's time would be divided among Civil and Nuclear Planning (25%), Training Coordination (20%), Information Technology (20%), Logistics (20%) and SERC (15%). (Id.).

A review of the description of Packard's position as Preparedness Branch Chief indicates that she was responsible for managing the department heads for the Nuclear Preparedness Department, the Planning Department and the Training and Exercise Department. (Pl. Ex. 4). As her position was described:

> Working closely with these department heads, the Preparedness Branch Chief ensures that the strategies and goals for these departments not only are consistent through the Branch, but also fall in line with the strategy and direction set forth by the agency's Director as well as the core mission established by the agency. The Preparedness Branch Chief is responsible for advising the Agency Director on issues related to these departments and ensures that federal and state regulations are being complied with and that good planning and training practices are being met. Working in collaboration with the other Branch Chiefs, the Preparedness Branch Chief will ensure that adequate resources are available for the reporting departments, identify local training, planning and exercise needs, and maintain a well-coordinated, cooperative working environment that fosters quality and efficiency within the Preparedness Branch. The management position will represent the Agency Director in grant negotiations with the nuclear power plants (Pilgrim, Seabrook and Vermont Yankee), and at times may be asked to represent the Agency Head before community groups, committees and associations for the purposes of building partnerships with local, state and federal governments, volunteer agencies, business and industry, and individual citizens focused on saving lives and property.

(Id.). Packard's time was to be divided as follows: supervise the Nuclear Preparedness Department manager and oversee department issues (25%); supervise the Planning Department manager and oversee department issues (25%); supervise the Training and Exercise Department manager and oversee department issues (25%); advise, report to, and represent the Agency Head on any and all matters related to nuclear preparedness, planning, training and exercise (25%). (Id.).

According to Packard, and as reflected in her 2007 evaluation, she had considerable involvement in the upgrade "to two significant web-based tools for MEMA-eCEMP and the online training registration system" and other IT projects. (PF ¶ 4; Pl. Ex. 7). She also contends that she had "significant experience in logistics as it is an essential part of planning in emergency management" as well as "significant post disaster field experience" and "operational experience." (PF ¶¶ 5-7).

As noted above, Richard Fitzgerald was hired as the new Associate Director of Technical and Support Services on December 21, 2008. (DF ¶ 21). He had previously served as the Town Manager for the Town of Palmer, Massachusetts, and the City Manager of Barre, Vermont, after an 18 year career as a Lt. Colonel in the United States Air Force. (Pl. Ex. 20). In the military, his experience included, but was not limited to, being "[r]esponsible for a $60M joint forces experiment to develop, test, procure, and field Command and Control (C2) software for the United States Armed Forces[,]" overseeing and developing plans "to provide a continued flow of mission essential reconnaissance materials" to locations throughout the world, and participating in "all

-12-

operational war planning, nuclear employment and counter-proliferation, joint non-combatant evacuation, special operations, and crisis action planning on the Korean peninsula." (Pl. Ex. 20 at DEP 62). Nevertheless, Packard points to her more direct "state-level experience regarding emergency management" in support of her contention that she was more qualified for the position. (PF ¶ 61, see also ¶¶ 60-70).

Additional factual details relevant to this court's analysis are provided below where appropriate.

## III. ANALYSIS

### A. Summary Judgment Standard of Review

Summary judgment is appropriate when the moving party shows, based on the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'" Vineberg, 548 F.3d at 56 (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)). "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require

trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994). "[T]he nonmoving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial. Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)). The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. See Vineberg, 548 F.3d at 56. "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." Walsh v. Town of Lakeville, 431 F. Supp. 2d 134, 143 (D. Mass. 2006).

### B.   FMLA

#### Overview

Under the FMLA, an employee is entitled to 12 weeks of leave for, among other things, the birth of a child. 29 U.S.C. § 2612(a)(1)(A). Upon return from an FMLA leave, the employee "is entitled to return to the same position or an alternate position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority." Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998) (citing 29 U.S.C. § 2614(a)(1); 29 C.F.R. §§ 825.100(c) (1997)). The right to reinstatement after taking a medical leave is a "prescriptive" right, that is one to which the employee is entitled under the FMLA. Crevier v. Town of Spencer, 600 F. Supp. 2d 242, 255 (D. Mass. 2008).

"Because the issue is a right to an entitlement, the employee is due the benefit if the statutory requirements are satisfied, regardless of the intent of the employer." Id. at 255-56 (quoting Hodgens, 144 F.3d at 159).

The FMLA also provides protection against interference with an employee's exercise of the rights provided by the Act. These rights, including the right to be free from retaliation for the taking of FMLA leave, are deemed "proscriptive" rights. Id. at 256. Thus, employers may not "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." Hodgens, 144 F.3d at 160 (quoting 29 C.F.R. § 825.220(c)). In the case of proscriptive rights, "the employer's motive is relevant, and the issue is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason. Such issues are analogous to those raised in cases involving other types of discrimination," and are decided under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Hodgens, 144 F.3d at 160.

In the instant case, Packard has asserted both that MEMA violated her prescriptive right to be returned to a comparable position, and her proscriptive right not to be retaliated against for exercising her FMLA rights. Packard contends that she was discriminated against by being terminated and by not being offered the new Associate Director of Technical and Support Services position. As detailed below, this court finds that Packard has not established a violation of her prescriptive rights, as the new position was not the

equivalent of the position she held before taking FMLA leave. However, this court also finds that Packard has presented sufficient evidence to support her claim for violation of her proscriptive right not to be retaliated against by not being given the opportunity to apply for the new position. Each of these claims will be discussed separately.

### Right to an Equivalent Position

The FMLA does not preclude an employer from reorganizing a workplace even if an employee on leave will be affected. Thus, "the obligation to restore an employee who has taken leave is qualified; if a change in position would have occurred regardless of whether the employee took leave, the FMLA does not protect him against such change." Dressler v. Cmty. Serv. Commc'ns, Inc., 115 Fed. Appx. 452, 453 (1st Cir. 2004), quoted in Gil v. Vortex, LLC, 697 F. Supp. 2d 234, 242 (D. Mass. 2010). In addition, the FMLA does not require an employer to return an employee to his or her prior position, it must merely provide the employee with "equivalent work and compensation under the Act." Watkins v. J&S Oil Co., Inc., 164 F.3d 55, 59 (1st Cir. 1998). "[E]quivalent" work is "that which is substantially equal or similar, not necessarily identical or exactly the same." Id.

In the instant case, Packard contends that the new position of Associate Director of Technical and Support Services was equivalent to her work as Preparedness Branch Chief. However, even according to Packard, the new position involved two new substantive areas: information technology, which was to be 20% of the position, and logistics, which was to constitute another 20% of the Associate Director's responsibilities. In

-16-

addition, the new position was classified as a Manager VIII position, not the level VII position of Packard's Branch Chief position. Regardless whether Packard was qualified for the new position (see discussion, infra), the undisputed facts establish that it was a new position with additional substantive responsibilities. This is not a situation where Packard's Branch Chief's position was merely repackaged and renamed. See Smith v. F.W. Morse & Co., Inc., 76 F.3d 413, 423 (1st Cir. 1996) ("When an employer defends an employment discrimination case on the ground of position elimination, the position may not, like a Dali painting, fade from one image to another only for the first image to reemerge at the blink of an eye."). The undisputed facts simply would not support a finding that the positions were substantially similar. See Weston-Smith v. Cooley Dickinson Hosp., Inc., 153 F. Supp. 2d 62, 72 (D. Mass. 2001) (where newly created position subsumed many of the employee's responsibilities, but also included significant additional responsibilities, terminated employee did not establish a discriminatory intent in reorganization), aff'd, 282 F.3d 60 (1st Cir. 2002). Therefore, Packard's claim that MEMA violated her prescriptive rights under the FMLA by failing to install her in the newly created Associate Director position must fail.

### Right to Be Free From Retaliation

Packard contends that the defendants wrongfully retaliated against her for taking FMLA leave. To the extent that she is suggesting that the entire reorganization was undertaken for the purpose of punishing her for taking FMLA leave, this claim is not supported by the record and must fail. However, the plaintiff has raised sufficient facts

for a jury to consider whether the defendants' refusal to consider her application for the new Associate Director position was in retaliation for her taking FMLA leave.

"To make out a prima facie case of retaliation, [Packard] must show that (1) [s]he availed [herself] of a protected right under the FMLA; (2) [s]he was adversely affected by an employment decision; (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." Hodgens, 144 F.3d at 161. "[T]he burden for establishing a prima facie case is not onerous." Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 14 (1st Cir. 2007). Here, there is no question that Packard availed herself of her right to take leave under the FMLA, that her work was satisfactory and that she was adversely affected by the decisions to terminate her employment and/or not to consider her as a contender for the new position. The issue is where she has established a prima facie case of a causal connection between her taking leave and MEMA's adverse employment action.

Packard appears to argue that the entire reorganization was a charade. Thus, she contends that the fact that she was the only Branch Chief adversely affected by the reorganization, and the communications between Boyce and the HR department, which she views as evidencing an intent to circumvent the rehire requirement of the FMLA, could support a jury finding that the alleged reorganization was designed for the purpose of eliminating MEMA's obligation to rehire her. (See Pl. Opp. at 9). This court disagrees. Even assuming that Packard is correct, and that her colleagues' departures were voluntary and not part of a reorganization strategy, she still has not put forward any

evidence from which a jury could find that the reorganization was a pretext for eliminating her position. While the reorganization may have been made easier by the voluntary departure of the other Branch Chiefs and Chief of Staff, it was discussed well before their departures. (See DF ¶ 6; PF ¶ 24). The internal communications on which plaintiff relies between Boyce and the HR personnel, as well as the relevant job descriptions and communications between Packard and Boyce, make it clear that there was, in fact, a reorganization planned and executed by Boyce as the new Director of MEMA. (See, e.g., Pl. Exs. 14, 16; Def. Ex. J). Instead of three Branch Chiefs and one Chief of Staff, the organization was restructured to have one Deputy Director of Field Services and two Associate Directors, with a different reporting hierarchy. (See, e.g., Def. Ex. H). There is nothing in the record which would support the conclusion that the reorganization was a charade designed for the purpose of eliminating Packard's position. Rather, "[t]he record is clear that the reorganization had an independent, rational basis, untainted by any animus against plaintiff." Weston-Smith, 153 F. Supp. 2d at 72.[2]

On the other hand, Packard has presented support for a claim that she was precluded from consideration for the Associate Director position in retaliation for her

---

[2] Packard also argues that the court should consider the temporal proximity between her termination and her leave. See Oliver v. Digital Equip. Corp., 846 F.2d 103, 110 (1st Cir. 1988) ("A showing of discharge soon after the employee engages in an activity specifically protected by [Title VII] ... is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation."). Here, however, Boyce's coming on as Director of MEMA and his reorganization fortuitously coincided with the plaintiff's maternity leave. Any temporal proximity does not bear any particular significance.

having taken FMLA leave. As an initial matter, she has put forth sufficient facts for a jury to find that Boyce had made it clear that Packard's application for the new position would not be considered. Furthermore, she has put forth sufficient evidence for a jury to find that she was qualified for the position. As evidence of a causal connection between Packard's FMLA leave and Boyce's refusal to consider her for a position, a jury may look at the fact that Boyce was telling Packard early on in her maternity leave that the reorganization could not await her return to the agency. Nevertheless, the position was not filled until months after Packard would have returned from leave, calling into question the sincerity of Boyce admonition that the reorganization could not wait. In addition, a jury could find that Boyce had made up his mind that Packard would not be allowed to return from leave even before the reorganization was approved. Specifically, Packard has presented evidence showing that Boyce worked with her colleagues but not with her, thanked her for her years of service before she even left, and removed her name from the telephone directory before the reorganization was even in place. Moreover, the communications between Boyce and the HR department provide evidence of an effort to "use the right words" to comply with the FMLA. A jury may find that such evidence establishes an attempt to manipulate the situation to pretend to comply with the law. Furthermore, but without limitation, the jury can draw adverse inferences from the fact that Packard, unlike McBride, was not even allowed to assume an "acting" position as the Associate Director of Technical and Support Services for the few months she needed to have her pension vest, even though the position remained open between McBride's

-20-

departure and the new hire.[3] In sum, a jury can find that Packard's exclusion from the reorganized agency was in retaliation for her taking leave, and was not based on merit. Packard has met "the relatively low threshold showing necessary to establish a prima facie case[.]" Hodgens, 144 F.3d at 165-66.

Since Packard has established a prima facie case of discrimination, the burden shifts to the employer to articulate a "'legitimate, nondiscriminatory reason'" for the adverse employment action "sufficient to raise a genuine issue of fact as to whether it discriminated against the employee." Id. at 160 (quoting McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824). "If the employer's evidence creates a genuine issue of fact, the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for [the adverse employment action] was in fact a pretext for retaliating against [her] for having taken protected FMLA leave." Id. at 161.

In the instant case, MEMA has taken the position that Packard did not have the qualifications or experience necessary for the new position. (DF ¶¶ 19-20). In light of

---

[3] The facts relating to Packard's ability to qualify for a pension are not fully developed in connection with the summary judgment motion. However, it seems that Packard may be able to establish that she was denied the option of at least filling the new position temporarily in order to qualify for her pension due to discriminatory reasons, since McBride was entitled to hold the position on a temporary basis for the stated purpose of assisting him in getting his pension. While "an employer can avoid liability under the FMLA if it can prove that it would not have retained an employee had the employee not been on FMLA leave[,]" here the issue is more complicated as there is some indication that Packard should have been offered at least a temporary position. Yashenko v. Harrah's NC Casino Co., LLC., 446 F.3d 541, 547 (4th Cir. 2006) (internal quotation omitted).

the fact that the job description was different than Packard's old position, and the new

position was at a higher pay level, MEMA has met its burden at this stage of articulating

a legitimate, nondiscriminatory reason, which is "only a burden of production[.]"

Weston-Smith, 153 F. Supp. 2d at 70. Therefore, "the presumption of unlawful

discrimination disappears" and the burden of persuasion shifts back to Packard "to

establish by a preponderance of the evidence 'that the legitimate reasons offered by the

defendant were not its true reasons, but were a pretext for discrimination.'" Id. (quoting

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141, 120 S. Ct. 2097, 147 L.

Ed. 2d 105 (2000) (internal quotation omitted)).

Here, Packard has put forth sufficient evidence which, if believed by the jury,

would satisfy the third stage of the burden shifting analysis. A jury could find that Boyce

never actually looked at Packard's qualifications, and that, if he had, he would have seen

that she had the IT, logistics and operational experience to qualify for the new Associate

Director position. An "employer's misjudging of an employee's qualifications, while not

necessarily dispositive, may be probative of whether the employer's reasons are pretexts

for discrimination." Hodgens, 144 F.3d at 169 (quoting Ezold v. Wolf, Block, Schorr &

Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992) (additional quotations and internal

punctuation omitted)). Packard's qualifications, along with the other factors discussed

above indicating that Boyce had determined that he would not consider Packard for the

new position, despite the fact that the position was not filled until after she would have

returned from leave, are sufficient to withstand the defendants' motion for summary judgment on the FMLA count.[4]

## C. Discrimination

### Sex Discrimination and Retaliation

Packard contends that the defendants subjected her to sex discrimination, a hostile work environment, and retaliation in violation of both Title VII, 42 U.S.C. 2000e, et seq. (Count I), and Mass. Gen. Laws ch. 151B (Count III). For the reasons detailed herein, the defendants' motion for summary judgment as to these counts should be allowed in part and denied in part.

The analysis of a gender discrimination claim under federal and Massachusetts law is essentially the same, and they can be considered together.[5] See Beal v. Bd. of Selectmen of Hingham, 419 Mass. 535, 544 n.5, 646 N.E.2d 131, 138 n.5 (1995), and case cited; Gauthier v. Sunhealth Specialty Servs., Inc., 555 F. Supp. 2d 227, 237 n.7 (D. Mass. 2008). Under both state and federal law, it is unlawful for an employer "to fail or

---

[4] Packard also argues that there is evidence that she was more qualified than the successful candidate. However, her argument ignores Fitzgerald's military experience. The record does not support a finding that Packard's qualifications so greatly exceeded Fitzgerald's that the failure to hire her was apparently due to discrimination.

[5] The one relevant distinction between Massachusetts and federal law is that, "[u]nlike the federal anti-discrimination statutes ... Chapter 151B provides for individual liability" under a theory of aiding and abetting. Orell v. UMass. Mem'l Med. Ctr., Inc., 203 F. Supp. 2d 52, 65 (D. Mass. 2002). Therefore, Packard has asserted a claim against both Boyce and MEMA under Chapter 151B (Count III). Since Boyce was the individual who engaged in the challenged conduct, his liability is coterminous with MEMA's liability under Chapter 151B for the present summary judgment purposes. See id.

refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). See also Mass. Gen. Laws ch. 151B, § 4(1). Discrimination on the basis of pregnancy is a form of sex discrimination. See Rhodes v. JPMorgan Chase & Co., 562 F. Supp. 2d 186, 193 (D. Mass. 2008). Analysis of Packard's sex discrimination claims follows the same McDonnell Douglas burden-shifting analysis described above. (See Def. Mem. (Docket No. 24) at 22 (analysis of FMLA retaliation claim the same as claim for sex discrimination)).

For the reasons detailed above, Packard cannot establish a prima facie case that her position was eliminated as a result of sex discrimination.[6] On the other hand, she has raised a genuine issue as to whether MEMA's failure to offer her even a temporary Associate Director's position, or to consider her for the new position, was due to, or in retaliation for, her pregnancy leave, and was not based on the merits.

---

[6] This court recognizes that the formulation of the prima facie case the plaintiff needs to establish varies a bit with the type of discrimination and adverse job action being claimed. See, e.g., Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 116, 731 N.E.2d 1075, 1084 (2000) (elements of prima facie case "may vary depending on the specific facts of the case"), quoted in Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 42, 825 N.E.2d 522, 531-32 (2005). Since none of the parties relies on the nuanced differences between the elements of a prima facie case in FMLA, sex discrimination, and retaliation cases, they will not be discussed herein. Suffice it to say that in order to establish her prima facie claim, Packard must produce some evidence that the adverse job action "occurred in circumstances that would raise a reasonable inference of unlawful discrimination." Sullivan, 444 Mass. at 45, 825 N.E.2d at 533-34.

**Sexual Harassment**

Sexual harassment is a form of gender discrimination that is prohibited by Title VII and Mass. Gen. Laws ch. 151B. See O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001). To prevail on a hostile work environment claim the plaintiff must establish

> (1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Id., and cases cited. The fact finder must "examine all the attendant circumstances including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance. Rosario v. Dept. of Army, 607 F.3d 241, 247 (1st Cir. 2010).

In the instant case, the most liberal reading of Packard's allegations is that Boyce favored her male colleagues while she was working, failed to return her calls while she was on leave, and treated her unfairly just because she was taking maternity leave. While, as detailed above, such conduct may support a claim of discrimination, it does not establish sexual harassment or a hostile work environment. See Pomales v. Celulares Telefonica, Inc., 447 F.3d 79, 83-84 (1st Cir. 2006) (summary judgment appropriate on

claim of sexual harassment where a fact finder could not conclude that the plaintiff was subject to a hostile work environment).

For these reasons, this court recommends that the defendants' motion for summary judgment as to Packard's claim of sex discrimination and retaliation found in Counts I and III of her complaint be denied with respect to her claim that she was wrongfully excluded from consideration for the Associate Director's position, but otherwise allowed.

### D.    Intentional Interference with a Contract

In Count IV of her complaint, Packard is seeking to hold Boyce individually liable for intentional interference with Packard's contractual relations with MEMA. The defendants contend that Boyce is entitled to summary judgment on this claim because there are no facts showing that Boyce acted with malice when he terminated Packard's employment with the agency. For the reasons that follow, this court finds that there are questions of fact which preclude judgment for Boyce on this claim.

In order to prevail on a claim for unlawful interference with contractual relations, "[a] plaintiff must prove that: (1) [s]he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." Draghetti v. Chmielewski, 416 Mass. 808, 816, 626 N.E.2d 862, 868 (1994). Where, as here, the defendant is the plaintiff's supervisor, the defendant "is 'privileged to act as he did unless he acted out of malevolence, that is, with actual malice.'" Boothby v. Texon, Inc., 414 Mass. 468, 487, 608 N.E.2d 1028,

-26-

1040 (1993) (quoting Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 663, 429 N.E.2d 21,

24 (1981)) (additional quotations omitted). Thus, the plaintiff must prove that the

defendant acted "for a spiteful, malignant purpose, unrelated to the legitimate corporate

interest." Id. (quotations and citations omitted).

As described above, Packard has presented sufficient facts to support her claim

that Boyce retaliated against her for exercising her legal right to take a maternity leave.

Because "it follows logically that the elements underlying a claim for unlawful retaliation

may be used to show malice when a tortious interference claim is brought against a

supervisor in a loss-of-employment case[,]" the question of liability on Count IV should

be left to a jury. See Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 77 (1st Cir.

2001).

### E.  Intentional Infliction of Emotional Distress

Finally, the defendants have moved for summary judgment on Count V, by which

Packard is seeking to hold Boyce individually liable for intentional infliction of emotional

distress. The defendants argue that this claim is barred by the exclusivity provisions of

the Massachusetts Workers' Compensation Act, and that in any event, Packard has failed

to present sufficient evidence to support her emotional distress claim. While this court

finds that the Workers' Compensation Act does not preclude Packard from pursuing such

a claim, the plaintiff's failure to present evidence showing that Boyce engaged in extreme

and outrageous conduct is fatal to her claim. Therefore, this court recommends that the

motion for summary judgment be allowed with respect to Count V.

## Exclusivity Under the Workers' Compensation Act

The Massachusetts Worker's Compensation Act, Mass. Gen. Laws ch. 152,

> provides to employees who are injured on the job the exclusive
> remedy against their employers who, by paying workers' compen-
> sation insurance premiums, are protected from civil suits. It also
> provides the exclusive remedy against coemployees who engage in
> tortious conduct within the course of their employment and in
> furtherance of the employer's interest.

Brown v. Nutter, McClennen & Fish, 45 Mass. App. Ct. 212, 216, 696 N.E.2d 953, 956

(1998). However, "[w]here a fellow employee commits an intentional tort not related to

the interests of the employer . . . the policies behind the act would not be served by

immunizing the coemployee." O'Connell v. Chasdi, 400 Mass. 686, 690, 511 N.E.2d

349, 351 (1987). Therefore, the exclusivity provisions of the Workers' Compensation

Act do "not immunize [Boyce] from [Packard's] claim of intentional infliction of

emotional distress if his alleged tortious conduct . . . did not further [MEMA's] interest."[7]

Brown, 45 Mass. App. Ct. at 216, 696 N.E. 2d at 956.

The evidence presented by Packard, if proven, would establish that Boyce's

decision to terminate her employment without giving her an opportunity to apply for the

---

[7] The case of Green v. Wyman-Gordon Co., 422 Mass. 551, 664 N.E.2d 808 (1996),
cited by the defendants in their brief, does not suggest that the exclusivity provisions of the
Workers' Compensation Act immunize fellow employees from liability for intentional torts where
the tortious conduct is unrelated to the employer's interests. In that case, the Massachusetts
Supreme Judicial Court determined that the exclusivity provisions of the Act bar emotional
distress claims against an employer that arise out of the actions of a fellow employee. See Green,
422 Mass. at 558-59, 664 N.E.2d at 813. However, it did not address the situation presented in
this case, where the plaintiff brings such claims directly against the co-employee tortfeasor.

new Associate Director position, or to at least return to MEMA until she could secure

alternative employment, was based on retaliatory animus rather than on any effort to

serve the agency. Such conduct does not further the interests of the employer. See

O'Connell, 400 Mass. at 690, 511 N.E.2d at 351 (finding that defendant's conduct in

making unwanted sexual advances toward the plaintiff and criticizing plaintiff for

rejecting such advances "was in no way within the scope of employment furthering the

interests of the employer"). Accordingly, the defendants have not shown that Packard's

emotional distress claim is barred by the Workers' Compensation Act.

## Sufficiency of the Evidence

Nevertheless, this court finds that Packard is unable to satisfy the elements of her

emotional distress claim against Boyce on the merits. In order to prevail on her claim, the

plaintiff must establish that

> (1) [Boyce] "intended to inflict emotional distress or that he knew or
> should have known that emotional distress was the likely result of
> his conduct"; (2) [Boyce's] "conduct was extreme and outrageous,
> was beyond all possible bounds of decency and was utterly intoler-
> able in a civilized community"; (3) [Boyce's'] "actions ... were the
> cause of [Packard's] distress"; and (4) "the emotional distress [she]
> sustained ... was severe and of a nature that no reasonable [person]
> could be expected to endure it."

Brown, 45 Mass. App. Ct. at 218, 696 N.E.2d at 957 (quoting Agis v. Howard Johnson

Co., 371 Mass. 140, 144-45, 355 N.E.2d 315, 318-19 (1976)).

The defendants contend that Packard is not able to satisfy the second element of

her claim because the undisputed facts do not establish that Boyce's conduct was

sufficiently extreme and outrageous to support liability. This court agrees. The Massachusetts Supreme Judicial Court ("SJC") has cautioned that "the door to recovery [for intentional infliction of emotional distress] should be opened but narrowly and with due caution[,]" and that "[a] principal bulwark against excessively broad recovery is the requirement that the defendant must have engaged in 'extreme and outrageous' conduct." Foley v. Polaroid Corp., 400 Mass. 82, 99, 508 N.E.2d 72, 82 (1987) (quotations and citations omitted). Thus, as the SJC has explained,

> it [is not] enough "that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort"; rather, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

Id. (quoting Restatement (Second) of Torts § 46, comment d (1965)).

The undisputed facts in the instant case do not demonstrate that Boyce's actions were so extreme "as to go beyond all possible bounds of decency." "[T]he mere fact that the defendant['s] conduct may turn out to be violative of the plaintiff['s] civil rights does not, in and of itself, necessitate a finding that the conduct is sufficiently egregious to state a claim for intentional infliction of emotional distress." Guckenberger v. Boston Univ., 957 F. Supp. 306, 319 (D. Mass. 1997). Moreover, in light of the undisputed evidence that Packard's position as Preparedness Branch Chief was legitimately eliminated as part of a reorganization, no reasonable jury could conclude that Boyce's actions in terminating

her employment without giving her an opportunity to apply for the Associate Director position were extreme and outrageous. Therefore, this court recommends that summary judgment be entered for Boyce with respect to Count V.

## IV. CONCLUSION

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Defendants' Motion for Summary Judgment (Docket No. 22) be ALLOWED IN PART and DENIED IN PART. Specifically, this court recommends that Packard's claim of hostile work environment be dismissed, but that her remaining claims of sex discrimination and retaliation in Counts I and III proceed to trial; that Packard's claim that her termination violated the FMLA be dismissed, but that her claim in Count II that the defendants violated the FMLA by refusing to consider her for, or allowing her to apply for, the new Associate Director position proceed to trial; that her claim against Boyce for intentional interference (Count IV) proceed to trial; and that her claim of intentional infliction of emotional distress (Count V) against Boyce be dismissed.[8]

---

[8] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-

_____/ s / Judith Gail Dein_____
Judith Gail Dein
U.S. Magistrate Judge

---

54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp.,
199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir.
1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).